**S. AMANDA MARSHALL, OSB # 95347**
United States Attorney
District of Oregon
**KATHLEEN L. BICKERS, OSB # 85151**
Kathleen.Bickers@usdoj.gov
Assistant United States Attorney
**BRANDON A. KLINE**
Brandon.Kline@usdoj.gov
Certified Law Clerk
United States Attorney's Office
1000 SW Third Avenue, Suite 600
Portland, OR 97204
Telephone:     (503) 727-1060
Facsimile:     (503) 727-1117
          Attorneys for Defendant U.S. Department of Education

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| In re | ) | Bankruptcy Case No. 13-37862-rld7 |
| | ) | |
| MARK EDWARD BERRY | ) | |
| VALERIE JOAN BERRY, | ) | Adv. Proc. No. 14-03024-rld |
| | ) | |
| Debtors. | ) | |
| | ) | |
| ——————————————— | ) | |
| | ) | |
| MARK EDWARD BERRY, | ) | DEFENDANT UNITED STATES |
| VALERIE JOAN BERRY | ) | DEPARTMENT OF EDUCATION'S |
| | ) | TRIAL BRIEF |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. DEPARTMENT OF EDUCATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| ——————————————— | ) | |

Defendant, United States Department of Education ("DOE"), submits this trial brief.

**Page 1 -**     **DEFENDANT UNITED STATES DEPARTMENT OF EDUCATION'S TRIAL BRIEF**
          *Berry v. U.S. Dep't of Education*; Adv. Proc. No. 14-03024-rld

## I. NATURE OF THE ACTION

Mark Edward Berry and his wife Valerie Joan Berry ("Plaintiffs") are Chapter 7 debtors. They are not represented by counsel. Plaintiffs filed a complaint in this adversary action to discharge their DOE student loan debt pursuant to 11 U.S.C. § 532(a)(8). DOE filed an answer denying dischargeability of the debt. This matter is being tried as consolidated concurrently with Adversary Proceeding No. 13-03064-elp. The additional student loan creditor in that case is Educational Credit Management Corporation ("ECMC").

## II. LOAN BALANCE

Plaintiff Mark Edward Berry has an unpaid DOE loan balance of approximately $55,000, which has been held in forbearance by the Department of Education since 2008.

Plaintiff Valerie Joan Berry has an unpaid DOE loan balance of approximately $72,500, which she recently consolidated. In a motion filed April 3, 2015, DOE moved to dismiss Valerie Joan Berry's petition for discharge with respect to her pre-petition DOE loans. (Docket No. 35). It is DOE's position that her recent post-petition consolidated loan should not be considered in these proceedings.

In the concurrent adversary proceeding, ECMC separately asserts a claim for its unpaid loan balance against Valerie Joan Berry. The United States has been advised that Valerie Joan Berry has not consolidated the outstanding ECMC loan debt.

## III. DEFENDANT'S WITNESSES

DOE expects to call one witness, Michael Illes, Senior Loan Analyst, U.S. Department of Education who will testify by telephone pursuant to a prior order of this Court. The summary of Mr. Illes' testimony is filed herewith.

## IV.   DEFENDANT'S EXHIBITS

Defendant expects to offer 10 exhibits, as set forth in the List of Trial Exhibits filed herewith.  All exhibits have been shared with Plaintiffs.

## V.   STATEMENT OF MATERIAL FACTS

Plaintiffs live in Prineville, Oregon.  In 2011, while Mark Edward Berry's loans were held in forbearance, Plaintiff liquidated his pension to purchase a 10,000 square foot lot of land and a remodeled 1,100 square foot mobile home. Deposition of Mark Edward Berry, Nov. 28, 2014, (hereinafter "*Mark Deposition*"), Excerpts attached and marked as Attachment 2, p. 8. They have no dependents. Deposition of Valerie Joan Berry Deposition, November 28, 2014, (hereinafter "*Valerie Deposition*"), Excerpts attached and marked as Attachment 1, p. 3.

Mark Edward Berry originally incurred his student loan debt earning an electrical engineering technology certificate from ITT Technical Institute in Portland in 1993. Mark Edward Berry has had a stable job for more than 10 years, currently earning approximately $83,000 per year as a field service technician for Les Schwab.  Because of two Oregon misdemeanor convictions for animal abuse and criminal mischief, connected to intentionally using a firearm to kill a neighbor's Llama, Mark Edward Berry is not able to be bonded.  Despite this impediment, Mark Edward Berry has proven himself to be indispensable to his employer, and expects to remain employed for the foreseeable future. Attachment 2, pp. 2 and 5.   The Les Schwab Corporation provides Mark and Joan Berry with health insurance coverage.  Mark Edward Berry frequently travels for work to various states. Attachment 2, p. 6, 7. ("I have a basic living on the road. I'm home three or four, maybe five nights a month sometimes.").  Because Les Schwab provides Mark Edward Berry with free meals and lodging during these travels, and

because Plaintiff has a "basic living on the road," it follows that a great majority of Mark Edward Berry's meals are provided for free. *Id*.

Plaintiff Valerie Joan Berry originally incurred her student loan debt earning an associate degree in accounting in 2011. Valerie Joan Berry worked at Les Schwab while attending Portland Community College, until her termination in 2009. Valerie Joan Berry held a range of positons following Les Schwab, but ultimately remained unemployed from 2009 until 2012 – during that time, Valerie Joan Berry filed only the minimum number of job applications required by the government to continue receiving unemployment benefits. Attachment 1, pg. 4. While Valerie Joan Berry has experienced chronic health problems, her recent back surgery is expected to relieve the pain and allow for a 70-75 percent chance of recovery.

Despite complaining of back problems preventing her from holding jobs requiring long periods of sitting, and even though "long haul" trips aggravate her condition, Valerie Joan Berry typically accompanies Mark Edward Berry on the all-expense paid excursions "because it's better than being at home alone." Attachment 1, pp. 5, 10, and 11. Valerie Joan Berry is not currently employed. She has never made a payment on her student loan balance, despite receiving $5,132.00 from a previous employer's profit sharing plan. Attachment 1, page 7. Instead, she used the money to purchase a used Ford Expedition. *Id*. Mark and Valerie Berry do not feel any "pressure" to honor their financial obligations to the United States. (See Attachment 1, pg. 11-12: "…they are not the one's calling… collection agencies calling you all the time and sending you nasty letters, and those are the kind of people that you pay; so…"). Plaintiffs' discretionary spending includes, among other things, $75 per month for cable television. $300 for the "More Everything Plan" for Verizon Wireless smartphones. Finally, Valerie Joan Berry has given her credit card to her adult daughter, and claims to provide "a lot" of support; treating the stay-at-

home wife of an apprentice lineman to expensive beauty treatments and shopping trips.
Attachment 1, pp. 11, ll. 19-22; 12, ll 1-12; and pg. 9).


## VI.     INCOME BASED REPAYMENT PLAN

In November 2013, Mark and Joan Berry were informed about the availability of the
Income-Based Repayment Plan ("IBRP") for their DOE student loan debt.  Under the IBRP, loan
payments are based on the applicant's Adjusted Gross Income ("AGI") (based on tax returns).
Since Plaintiffs are married and file income taxes jointly, the AGI for both Mark and Joan Berry
will be used to calculate their monthly payment. Here, Plaintiffs have an annual AGI of $83,397
(using figures from the 2013 Form 1040 Federal Tax Return), and a family size of two. Because
Valerie Joan Berry is currently unemployed, her assumed monthly contribution will be zero
dollars.

Under the IBRP plan, Plaintiffs' required monthly payment will be no more than 15
percent of the amount by which Plaintiffs' AGI exceeds 150 percent of the poverty line income
for their family size and state, divided by 12. Moreover, if annual income is below the poverty
level in any particular year, the monthly payments for the succeeding year will be zero. The
estimated Income Based Repayments would be $204 per month for Mark's loans and $384 per
month for Valerie's loans for a total $588 monthly payment.

## VI.     LEGAL BACKGROUND

Under section 523(a)(8) of the Bankruptcy Code, a debtor's loans are excepted from
discharge in bankruptcy, unless this would constitute an "undue hardship." 11 U.S.C.
§ 523(a)(8). To discharge student loan obligations under "undue hardship" case law, a debtor
bears the burden of proving each part of the three-part Brunner test.  *See United Student Aid*

*Funds, Inc. v. Pena*, 155 F.3d 1108, 1112 (9th Cir. 1998) (adopting the *Brunner* test from the Second Circuit). A debtor must prove: 1) that they cannot maintain, based on current income and expenses, a minimal standard of living for their self and their dependents if forced to repay; 2) that additional circumstances exist indicating this state of affairs is likely to persist for a significant portion of the repayment period of the student loans, and; 3) that debtor has made good faith efforts to repay the loans. *See Craig v. Educational Credit Management Corp.*, 579 F.3d 1040, 1044 (9th Cir. 2009). The burden of proving undue hardship is on the debtor, and the debtor must prove all three parts before discharge can be granted. *See In re Mason*, 464 F.3d 878, 882 (9th Cir. 2006). If the debtor fails to satisfy any one of the *Brunner* requirements, "the bankruptcy court's inquiry must end there, with a finding of no dischargeability," *In re Rifino*, 245 F.3d 1083, 1087-88 (9th Cir. 2001).

To satisfy the first part of *Brunner,* a debtor must show more than tight finances. Instead, it must be "unconscionable" to require the debtor to increase their income or decrease expenses. *In re Birrane*, 287 B.R. 490, 495 (B.A.P. 9th Cir. 2002). A "minimal standard of living" does not mean a middle-class lifestyle, and contemplates that a debtor can be required to make "major personal and financial sacrifices." *Education Credit Management Corp. v. Howe (In re Howe),* 319 B.R. 886, 889-90 (B.A.P. 9th Cir. 2005).

To satisfy the second part of the *Brunner* test, "the debtor must prove that their present inability to pay will likely persist throughout a substantial portion of the loan's repayment period." *In re Nys*, 446 F.3d 938, 945 (9th Cir. 2006). "Congress sought to prohibit a 'garden variety debtor' from discharging student loans, especially when that 'garden-variety debtor' will presumably use their loan-funded education to substantially increase their income in the near future." *Id.* at 944. The debtor "must present something more than her current financial situation

**DEFENDANT UNITED STATES DEPARTMENT OF EDUCATION'S TRIAL BRIEF**
*Berry v. U.S. Dep't of Education*; Adv. Proc. No. 14-03024-rld

. . . [S]he must present the court with circumstances that she cannot reasonably change." *Id.* at 946 n.7. Otherwise, a court "will presume that the debtor's income will increase to a point where she can make payments and maintain a minimal standard of living." *Id.* at 946.

To satisfy the third part of *Brunner*, a debtor must establish a good-faith effort to repay their student loans. *See Mason*, 464 F.3d at 884. "Whether the debtor has made any payments or not is important" in determining good faith. *Educational Credit Management Corp. v. DeGroot*, 339 B.R. 201, 214 (D. Or. 2006). "The debtor's obligation to act in good faith only ends when the loan has been paid in full or discharged." *Id*. In evaluating good faith, courts "look[] to whether the debtor's financial misfortune is self-imposed through his negligence or irresponsibility in conducting his financial affairs." *In re Rosen*, 179 B.R. 935, 941 (Bankr. D. Or. 1995).

## VII.    APPLYING THE *BRUNNER* TEST.

Even if this Court denies DOE's motion to dismiss based on the consolidation, Valerie Joan Berry will not establish undue hardship under the first and second part of the *Brunner* Test. Although Valerie Joan Berry is not currently earning an income, she has received formal training and certification, qualifying her for employment that will improve her finances and enable her to service her student loan debt.  Indeed, Valerie Joan Berry is capable of doing "any job that she looks at." Attachment 2, page 4. Moreover, Valerie Joan Berry has failed to present the court authenticated documentation from a medical professional indicating circumstances that foreclose future earnings. Meanwhile, there is a 70 percent opportunity it's going to improve. *Id* at 3.

Plaintiff asserts a right to maintain her own "minimal standards" in terms of luxuries and garden variety consumption. Attachment 1, p. 6. However, discretionary spending on alcohol, splurging on manicures for grown children, cable television, iTunes, Kindle reading selections

and voracious charitable giving does not meet the *Brunner* Test for undue hardship. Moreover, Valerie Joan Berry concedes that Plaintiffs have a great deal of flexibility in their budget. Attachment 1, p. 12

Plaintiffs' pattern of profligate spending illustrates irresponsibility in conducting their financial affairs, and hence fails to satisfy the third part of *Brunner*. For one thing, the Plaintiffs' Adjusted Gross Income of $83,000.00 is more than 400 percent above the federal poverty guidelines for a family of two. Nevertheless, Mark Edward Berry has not serviced his loan balance since 2008, despite earning a very good income. And even when she was employed, Valerie Joan Berry never made a good faith effort to repay her student loan debt.

DATED this 7th day of April, 2015.

Respectfully submitted,

S. AMANDA MARSHALL
United States Attorney
District of Oregon

/s/ Kathleen L. Bickers
KATHLEEN L. BICKERS #85151
Assistant United States Attorney

/s/ Brandon A. Kline
BRANDON A. KLINE
Certified Law Clerk

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that the foregoing **DEFENDANT UNITED STATES**

**DEPARTMENT OF EDUCATION'S TRIAL BRIEF** was served on April 7, 2015, by

mailing a true copy addressed to the following, except those designated as receiving ECF notice,

who will be served electronically by ECF:


      Mark Edward Berry
      Valerie Joan Berry
      1502 N.W. Studebaker Drive
      Prineville, Oregon 97754
            Consolidated Plaintiffs, *pro se*

      Eryn Karpinski Hoerster
      Education Credit Management Corporation        ECF Only
            Attorney for Creditor


                     /s/ Kathleen L. Bickers
                     KATHLEEN L. BICKERS #85151
                     Assistant United States Attorney

**Page 9 -**   **DEFENDANT UNITED STATES DEPARTMENT OF EDUCATION'S
              TRIAL BRIEF**
              *Berry v. U.S. Dep't of Education*; Adv. Proc. No. 14-03024-rld

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

3


4   MARK EDWARD BERRY, VALERIE       )
    JOAN BERRY,                      )
5                                    ) Case No.
                    Debtors.         ) 13-37865-rld7
6   _____)
    MARK EDWARD BERRY,               )
7                                    )
                    Plaintiff,       ) Adv. Proc. No.
8                                    ) 14-0302-rld
            vs.                      )
9                                    )
    ASPIRE/DEPARTMENT OF             )
10  EDUCATION, et al.,               )
                                     )
11              Defendants.          )
                                     )
12  _____)
    VALERIE JOAN BERRY,              )
13                                   )
                    Plaintiff,       ) Adv. Proc. No.
14                                   ) 14-03025-rld
            vs.                      )
15                                   )
    ASC/DEPARTMENT OF EDUCATION,     )
16  et al.,                          )
                                     )
17              Defendants.          )
    _____)
18


19          DEPOSITION OF VALERIE JOAN BERRY

20        Taken in Behalf of the Defendants

21


22                 Portland, Oregon

23              November 28th, 2014

24


25


Teach Reporting, Inc.

```
 1              BE IT REMEMBERED That, pursuant to Federal

 2    Rules of Civil Procedure, the deposition of VALERIE

 3    JOAN BERRY was taken in behalf of the Defendants,

 4    before Robin Reger, Registered Professional

 5    Reporter, on Friday, the 28th day of November, 2014,

 6    commencing at the hour of 1:30 p.m., in the offices

 7    of the United States Attorney's Office, 1000 SW

 8    Third Avenue, Portland, Oregon.

 9

10                         --o0o--

11                      APPEARANCES:

12    For ECMC:

13                      Eryn Karpinski Hoerster
                        GARVEY SCHUBERT BARER
14                      121 SW Morrison Street
                        11th Floor
15                      Portland, OR 97204
                        503-228-3939 x3128
16                      ehoerster@gsblaw.com

17    For Defendant Department of Education:

18                      Kathleen L. Bickers
                        US ATTORNEY'S OFFICE
19                      1000 SW 3rd Avenue
                        Suite 600
20                      Portland, OR 97204
                        503-727-1060
21                      kathleen.bickers@usdoj.gov

22    Also Present:     Mark Berry

23

24

25
```

Teach Reporting, Inc.

```
 1     A       Stephanie, Nicole and Chelsea.

 2     Q       So those three plus --

 3     A       Mine.

 4     Q       -- your two.

 5     A       Plus my daughter had a baby as well.

 6  Well, that was in 2010.

 7     Q       Is that Ayden?

 8     A       Yes.

 9     Q       I saw that in the tax return.  Cute

10  name.  And this was Rachel's?

11     A       Yes.  She was pretty young.

12     Q       Who all is living at your house now?

13     A       Right now, just the two of us.

14     Q       Empty nest?

15     A       Yes.

16             MS. BICKERS:  That's a beautiful thing.

17             THE WITNESS:  It's only been about a

18  week; so.

19             MR. BERRY:  It seems like every time I

20  think it's going to be quiet, somebody else

21  shows up.

22             THE WITNESS:  And it's not necessarily

23  our children, it's our foster-type children.

24  We've got people moving in on us all the time.

25
```

```
 1    about.
 2              So I was applying probably way above my
 3    skills in a lot of jobs.  I remember applying at
 4    Crook County Courthouse for probably about 15
 5    different jobs, and school district.  That's the
 6    only things I can really remember.
 7         Q     Did you ever have interviews before you
 8    got your job at the hotel?
 9         A     Did I interview with anybody?  Seems
10    like I did.  I'm going to say no because I honestly
11    can't remember any.
12         Q     Do you have an estimate about how many
13    applications you had put in?  Was there a minimum
14    that you had to put in?
15         A     I know that there's a minimum now of
16    three a week, but I'm not sure that there was back
17    then.  And I know that I was -- like I said, I think
18    I was doing the minimum; so.
19         Q     Do you think that that's the main reason
20    you didn't get a job between 2009 and 2012 was
21    because a lack of jobs in your geographical area?
22         A     The unemployment in our area was about
23    18 percent so that would be a very good -- I can't
24    think of the word.  It probably is, yes.
25         Q     Any other reason why you feel like you
```

1    Q      Okay.  Are there any jobs you are able

2   to do now?

3    A      I don't feel like there is because I

4   can't stand for very long.  I can't sit for very

5   long.  One of the worst positions -- or one of the

6   worst things you can do when you have fibromyalgia

7   is to sit at a typewriter, and that's about the only

8   thing I know how to do.

9    Q      Have you investigated standing desks?

10  Have you heard of these things?  Look it up.  Look

11  it up when you go home.

12   A      Okay.

13       MS. BICKERS:  Yeah, they have them, and

14       we have a lot of them here.  I've got one.

15       But, yeah, for your back.

16       MR. BERRY:  So you can with a neck

17       problem --

18       MS. BICKERS:  Well, right now I've got a

19       cold a little bit or allergies.  But, yeah, so

20       that's good for you.

21       MS. KARPINSKI HOERSTER:  Because you can

22       also sit or stand.  If you need to sit, you can

23       sit.  If you need to stand, you can stand.  You

24       can bring -- the computer goes up and down; so.

25       MS. BICKERS:  Because sitting is so bad

1     Q      How much do you spend on that per month,

2  do you think?

3     A      I try not to do more than two books a

4  month.

5     Q      That's about $15?

6     A      Yeah.

7     Q      You try not to, but you are not always

8  successful?

9     A      I know exactly how many books I would

10  have if I looked at it, but I've only got maybe less

11  than 20 books on there total.

12     Q      Okay.  Is there a public library there

13  in Prineville?

14     A      Yes.

15     Q      Any reason why you don't go there?

16     A      I do use them.  I use them quite a lot.

17  I started reading the Alex Delaware novels, and they

18  don't have them at the library available, so on

19  Kindle.

20     Q      Is that part of minimal standards of

21  living?

22     A      Probably not.  It's part of my minimal

23  standards.  I guess everyone's definition of minimal

24  standards is different.  Have they actually come up

25  with a minimal standards of "different"?  I know

1   line 15A, you had a --

2        A      That was when I left Schwab.  They have

3   a profit sharing plan, and they gave me the money

4   out of it --

5        Q      Okay.

6        A      -- because I was no longer there.  So

7   they sent me a check.

8        Q      What did you do with that $5,312?

9        A      Well, I didn't get that much because

10  they took a bunch of taxes out of it.  What did we

11  do with it?  I think I paid off my car.  Pretty sure

12  I paid off my car.

13       Q      Okay.  And then later that year you got

14  a $6,438 refund.

15       A      Yeah, and that would make sense.  What

16  year is this, 2010?

17       Q      This is 2010.

18       A      I can guess.  I'm guessing we paid at

19  least 1500 of that out in property taxes, and

20  probably another thousand out in taxes for state

21  because that's usually about what we end up doing.

22  We paid our property taxes when we got our refunds.

23       Q      Okay.  The next year, 2011.

24       A      That was a good year.

25       Q      You got almost $50,000 --

```
 1      A       Fifty?

 2      Q       From a pension.

 3      A       Oh, yeah.  I said we took all the money

 4   out of his pension to buy a house.

 5      Q       And this is the house you live in now?

 6      A       Yeah.  We bought a old mobile home, had

 7   it moved to our property and put it in.

 8      Q       How much -- okay.  So what's the value

 9   of that house now?

10      A       I don't know.  On the whole property or

11   the house itself because --

12      Q       You had this 49,832 --

13      A       Yes.

14      Q       -- and you used all of that to buy your

15   house?

16      A       Right.

17      Q       And how much did you pay for the house?

18      A       We didn't get 49,000.  Again, they took

19   a whole bunch out in taxes.  I think we only got

20   like 30-something thousand.  The house was 16 to

21   buy, then we had to move it, which was about

22   another -- I think it was almost $10,000 between

23   everything.

24      Q       Okay.  And you already owned the land?

25      A       No.  It's mortgaged.  It's not ours.
```

BY MS. KARPINSKI HOERSTER:

    Q     Does she work?

    A     No.

    Q     Does her partner work?

    A     Uh-huh, yes.

    Q     What does he do?

    A     He's an apprentice lineman.

    Q     That sounds like it could be a good job.

    A     It could be, yes, when he's done.

    Q     Is she going to get a job?

    A     She was in school too, but he told her
to get out of school because they were having a
baby. Eventually, maybe. She's had four or five,
and she's lousy at them. She's better at spending
money than earning it.

    Q     Okay. And Bella Boutique, what is that?
I mean, is that --

    A     It's a clothes store.

    Q     Is that something that she needs or is
that you just giving money to her to be a nice mom?

    A     That's probably more me giving money to
her, being a nice mom.

    Q     Okay. Probably not minimal standards?

    A     No.

    Q     Okay. This looks like -- well, you tell

```
 1       Q       But you know what that is?  What does
 2  that involve?
 3       A       Sitting in a car.
 4       Q       For long periods of time.
 5       A       Oh, I know, believe me.  It hurts like
 6  hell.  I take a lot of painkillers.
 7       Q       Okay.  So that just doesn't make sense
 8  with the condition that you describe, which would
 9  prevent you from working.  I mean, I'm just throwing
10  that out there, if you've got any comment on that.
11            MR. BERRY:  I have a comment.
12            MS. BICKERS:  Sure.
13            MR. BERRY:  Most of the time she's not
14       very lucid because she's taking pills to get
15       where we're going, and I wake her up and say,
16       "Hey, look, the ocean."  And she's like...
17       (Gesturing.)
18  BY MS. BICKERS:
19       Q       Why would you do something like that
20  that would aggravate your condition?
21       A       Because it's better than being at home
22  alone.
23       Q       Have you reported to your doctor that
24  you take those long trips?
25       A       No.
```

Teach Reporting, Inc.

| | |
|---|---|
| 1 | Q    You're able to sit for that long. |
| 2 | A    I can't say that I'm able -- I mean, |
| 3 | when you say "able to sit," he stops a lot.  I'm |
| 4 | changing positions constantly.  So it's kind of like |
| 5 | when I'm at home sitting on the couch, I have to |
| 6 | change positions a lot, take a lot of pills, and I |
| 7 | guess that's why I do it is because I'm basically |
| 8 | doing the same thing. |
| 9 | Q    I mean, but when you are stuck in a car, |
| 10 | you're trapped in that position.  I mean, that's |
| 11 | hard to do even for a normal back, for those |
| 12 | long-haul trips.  Most people don't want to drive to |
| 13 | Denver because they want to fly. |
| 14 | A    Well, it took us three days to get |
| 15 | there, to be fair. |
| 16 | Q    That's amazing.  That's a long time to |
| 17 | be sitting.  I'm just saying. |
| 18 | A    I mean, because we stopped every night. |
| 19 | Q    Why is it that your student loans seem |
| 20 | to go to the bottom of the list for repayment in |
| 21 | your priorities? |
| 22 | A    I honestly don't know.  I guess -- |
| 23 | Q    Is it because there isn't as much |
| 24 | pressure from the student loans? |
| 25 | A    Probably.  They are not the ones that |

```
1    are -- I mean --
2         Q        Calling everyday?
3         A        Yeah.  Well, you have got collection
4    agencies calling you all the time and sending you
5    nasty letters, and those are the kind of people that
6    you pay; so.
7         Q        But it sounds like, based upon the
8    questions that Ms. Karpinski asked you, there's a
9    lot of flexibility in your budget to actually stop
10   cable, stop the Kindle, stop the discretionary
11   spending on the children --
12        A        Uh-huh.
13        Q        -- not have a $300 phone bill.  It
14   sounds like there's lot of discretion there.  What
15   would be your answer to that?
16             Is that just because, in your definition
17   of what minimal standards is, you need to have those
18   luxury items?
19        A        I would say, yes, that would be -- yeah.
20   I feel like I'm living at a far more low standard of
21   living than I have ever -- you know, have lived.
22        Q        Right.
23        A        So, yeah.
24        Q        Okay.  And at what point would you think
25   that you would be able to -- would you be willing to
```

```
 1                    CERTIFICATE

 2          I, ROBIN REGER, Certified Shorthand

 3  Reporter, do hereby certify that VALERIE JOAN BERRY

 4  appeared at the time and place set forth herein;

 5  that at said time and place I reported in stenotype

 6  all testimony adduced and other oral proceedings had

 7  in the foregoing matter; that thereafter my notes

 8  were transcribed using computer-aided transcription

 9  under my direction; and the foregoing transcript,

10  Pages 1 to 89, constitutes a full, true and accurate

11  record of such testimony adduced and oral

12  proceedings had and of the whole thereof.

13          Witness my hand and stamp at Portland,

14  Oregon, this 26th day of January, 2015.

15

16

17          _____

18          ROBIN REGER, RPR
            Certified Shorthand Reporter
            Certificate No. 10-0416

19

20

21

22

23

24

25
```

2          FOR THE DISTRICT OF OREGON

3

4  MARK EDWARD BERRY, VALERIE    )
    JOAN BERRY,                 )
5                           ) Case No.
               Debtors.    ) 13-37865-rld7
6 _____) 
    MARK EDWARD BERRY,        )
7                          )
             Plaintiff,   ) Adv. Proc. No.
8                          ) 14-0302-rld
        vs.                )
9                          )
    ASPIRE/DEPARTMENT OF      )
10 EDUCATION, et al.,        )
                          )
11          Defendants.  )
                          )
12 _____)
    VALERIE JOAN BERRY,     )
13                         )
             Plaintiff,   ) Adv. Proc. No.
14                         ) 14-03025-rld
        vs.                )
15                          )
    ASC/DEPARTMENT OF EDUCATION, )
16 et al.,                )
                          )
17          Defendants.  )
                          )
18 _____)

19        DEPOSITION OF MARK EDWARD BERRY

20      Taken in Behalf of the Defendants

21

22            Portland, Oregon

23          November 28th, 2014

24

25

```
 1      Q      And do you have any opportunity to move
 2  up at all or do you think --
 3      A      At this point, no.  I do field service.
 4  I go to new stores.  I set up computers.  They have
 5  me go to different locations that have different
 6  issues with phone systems -- no alarm systems, but
 7  basically just phone systems, computers, the cabling
 8  that makes them work, those things.
 9      Q      The guys who can figure things out --
10      A      Yes.
11      Q      -- and will get everybody running again
12  and fix it?
13      A      Generally, yes, unless something is
14  really bad.
15      Q      And so you are really very stable.  You
16  have very stable employment.
17      A      Yeah.
18      Q      And how long do you think that's going
19  to last?
20      A      I don't know, because I've had knee
21  surgery now two years ago, and they told me I have
22  about a 10-year run.
23      Q      Before you need replacements?
24      A      If I can take them, yes.  Because they
25  say that my bones -- I don't have good bone
```

1   are in a holding situation until you see what

2   happens with the surgery with your wife's back?

3       A    Yeah.

4       Q    There's a 70 percent opportunity it's

5   going to improve?

6       A    Not with our luck; but, yeah.

7       Q    So the financial picture, if it improves

8   enough, with as smart as she is and her skill set --

9   not that I'm saying she's the brains behind the

10  operation because obviously you've got your own

11  technical skills -- but she's pretty bright.  I'm

12  going to remember It's Deductible out of this.  And

13  so there's -- right now, you don't really know in

14  the future if it could improve where she would be

15  able to contribute to the family income?

16      A    And to be quite honest --

17      Q    What's your answer to that?

18      A    My answer is, I don't know what the

19  future holds.

20      Q    Yeah.

21      A    And I don't know how this back surgery

22  is going to go.  I know she's very capable of

23  working, I know, when she wasn't having the pain

24  issues.  I really don't understand fibromyalgia, and

25  that discovery was like, okay, I've got to research

1  that, but I know that -- it's like reading a book

2  about bankruptcy.  I've never known anybody else

3  that can do that.  I know she can do any job that

4  she looks at, but the problem is having the pain

5  interference and --

6      Q      And this back situation, that's the

7  variable out there still?

8      A      Yeah, what our future holds.

9      Q      Now, did somebody mention bipolar or did

10 somebody mention that?

11          MRS. BERRY:  No, I'm bipolar, too.

12          MS. BICKERS:  Does that affect your

13     employment?

14          MRS. BERRY:  I guess it would -- I would

15     say everything does because my moods, I have

16     very up and down moods.  I have what's called

17     cyclothymia, which your moods go like this all

18     the time as opposed to having highs and lows.

19     (Gesturing.)

20          MS. BICKERS:  What's your prescription

21     for Oxy?

22          THE WITNESS:  That's for the back pain.

23          MS. BICKERS:  I mean, how much?

24          MRS. BERRY:  I take 10 milligrams a day.

25          MS. BICKERS:  And have you --

```
 1         different ones, and you get the accumulation of

 2         moisture, and then you would hear her turn

 3         over, and she's drowning in yuck. (Gesturing.)

 4    BY MS. BICKERS:

 5         Q    So there's a number of things going on

 6    health wise.  You are waiting to see if the back

 7    surgery, that sort of thing improves.

 8              So your financial picture is pretty

 9    simple in that you've had a stable job for over 10

10    years now and with a good company.

11         A    Yeah.  And I know that they are not

12    bringing in people to replace me, and the only

13    problem is once -- how do I put it -- my department

14    basically won't exist because there's only two of us

15    left.  Other people have left to go different places

16    and retire, and basically our department is

17    dwindling down.  So if they get to a point and say,

18    well, it's not really worth it for us to maintain

19    this department, because they can call a contractor

20    in any of these regions, in Denver or Salt Lake or

21    whatever, and say, hey, we need you to run over to

22    this place, and they can be there in two hours.  To

23    me, that's scary.  I'm not saying that they have

24    threatened me with not having a job, but in the back

25    of my mind I know it's out there.  And because a lot
```

Teach Reporting, Inc.

```
 1    of the vending things -- like at our help desk, the
 2    job that I originally put in for, a good half of the
 3    people that perform that job now are vendors.  We
 4    bring them in from a temp agency, see if they work
 5    out; if they work out, they stay around; and after
 6    two or three years of them being a temp, they talk
 7    to them about hiring them.
 8         Q    Okay.  So there's some concern
 9    potentially --
10         A    There is for me.
11         Q    But right now --
12         A    Right now things are good.
13         Q    And the more overtime you work, the more
14    they tax, so you have really got to juggle the
15    overtime issue, too?
16         A    Well, you also have to, say, have a
17    basic standard of living, you said.  I don't have a
18    standard of living.  I have a basic living on the
19    road.  I'm home three or four, maybe five nights a
20    month sometimes.
21         Q    So they cover your food the whole time
22    you are gone?
23         A    They cover my food, within reason, but
24    hotel.
25         Q    That helps out with the household
```

```
 1   expenses; right?

 2        A     Well, yeah.

 3        Q     Because food for a man is -- it can be

 4   fairly expensive; so --

 5        A     You don't really understand how I eat

 6   because I had a gastric bypass surgery.

 7              MRS. BERRY:  So now it's not expensive

 8        to feed him.

 9              THE WITNESS:  And I eat peckish.

10   BY MS. BICKERS:

11        Q     But you go to a restaurant and get a

12   sandwich, and whatever you want --

13        A     I can't eat a sandwich because of the

14   bread usually.

15        Q     You get something, it's paid for?

16        A     Yes.

17        Q     And your hotel is paid for?

18        A     Yeah.

19        Q     And then your wife can join you, too?

20        A     At times.  I mean, it's one of those

21   things they say, you know, don't ask, don't tell

22   kind of thing.  You can go, but if there's an issue,

23   you are on your own.  Like if we were to go to

24   California, and she got sick and had to go to the

25   hospital, I mean, I'm supposed to be down there to
```

Teach Reporting, Inc.

```
 1                    CERTIFICATE

 2          I, ROBIN REGER, a Certified Shorthand

 3   Reporter, do hereby certify that MARK EDWARD BERRY

 4   appeared at the time and place set forth herein;

 5   that at said time and place I reported in stenotype

 6   all testimony adduced and other oral proceedings had

 7   in the foregoing matter; that thereafter my notes

 8   were transcribed using computer-aided transcription

 9   under my direction; and the foregoing transcript,

10   Pages 1 to 37, constitutes a full, true and accurate

11   record of such testimony adduced and oral

12   proceedings had and of the whole thereof.

13          Witness my hand and stamp at Portland,

14   Oregon, this 26th day of January, 2015.

15

16

17          _____
             ROBIN REGER, RPR
18           Certified Shorthand Reporter
             Certificate No. 10-0416
19

20

21

22

23

24

25
```